# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ALLSTATE LIFE INSURANCE COMPANY, an Illinois corporation, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 14-cv-7098 ) |
| STANLEY W. BURNS, INC., a Florida Corporation, and STANLEY W. BURNS, | ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is Defendants' motion to dismiss for lack of proper venue or in the alternative to transfer this matter to the Middle District of Florida. (R.7). For the following reasons, the Court grants in part and denies in part Defendants' Motion to Dismiss and transfers the case in its entirety to the Middle District of Florida.

## BACKGROUND

Plaintiff Allstate Life Insurance Company ("Allstate") filed a complaint alleging five counts against Defendants Stanley W. Burns, Inc. ("Burns, Inc.") and Stanley W. Burns ("Burns") (collectively, "Defendants"). Specifically, Allstate alleges breach of contract (R.1, Compl., Count I) and in the alternative unjust enrichment (Count II) against Burns, Inc. and also alleges unjust enrichment (Count III), intentional misrepresentation (Count IV), and fraud (Count V) against Burns.

Defendants move to dismiss Plaintiffs' Complaint under Rule 12(b)(3) for improper venue or in the alternative to transfer venue. (*See* Fed. R. Civ. P. 12(b)(3); 28 U.S.C. § 1406; R.9, Def.'s Mem. in Supp.)

## I. The Parties' Relationship

Allstate is an Illinois life insurance company with its principal place of business in Northbrook, Cook County, Illinois. (R.1, ¶ 2.) Allstate sells and services life insurance policies to the general public through agents and exclusive financial representatives. (*Id.*, ¶ 7.) Allstate also works with entities as exclusive financial specialists ("EFS") and enters into written agreements with its EFS known as the Allstate L2000C Exclusive Financial Specialist Independent Contractor Agreement ("L2000C Agreement"). Stanley W. Burns, Inc. ("Burns Inc." or "Agency") agreed to be an independent contractor for Allstate and become an Allstate EFS, authorized to solicit, sell and service life insurance policies and annuity contracts and such other business as Allstate authorized. (*Id.*, ¶¶ 3, 9, 10.) Burns Inc. is a Florida corporation owned and controlled by Stanley W. Burns ("Burns"), a citizen of Florida and the sole director, president, treasurer and shareholder of Agency. (*Id.*, ¶¶ 3, 4.)

## II. The L2000C Agreement and Related Contractual Provisions

On February 1, 2001, Allstate and Burns, Inc. entered into an L2000C Agreement. (*Id.*, ¶¶ 9, 10; R.1-1, attached as Ex. A to Allstate's Compl., R.1, ¶ 10.) The "Duties and Conditions" section of the L2000C Agreement indicates that "[t]his Agreement is being entered into with [Burns, Inc.] in reliance upon and in consideration of the skills, qualifications, and representations of [Burns]," referring to Burns as a "Key Person" employed to provide services under the Agreement. (R.1-1, § II.E; R.1, ¶ 12.) Burns was the licensed insurance agent, originator, and producer for Burns, Inc. (R.1, ¶ 10.) The L2000C Agreement also lists "Duties

2

and Conditions" which include the Agency's agreement "to comply with any and all applicable federal, state, or local laws, rules, regulations and ordinances affecting its operation". (R.1-1, § II.D.) The Agency also has specified obligations for maintenance of "all books and records relating to the business under this Agreement including, but not limited to, all checkbooks, check registers, deposit receipts, and general ledgers for a period of not less than five years after the close of the fiscal year to which they relate." (*Id.*, § XII.) The Notice provision of the L200C Agreement listed Florida addresses for both Allstate and Defendants and no other addresses were listed for either party. (*Id.*, § XX.) The L2000C Agreement also contained provisions related to payment of commissions, chargebacks, and attorneys' fees in the event of litigation. (R.1, ¶ 17.)

The L2000C Agreement incorporated terms and conditions from a Supplement, which provided, among other things, that Lincoln Benefit Life Company and American Heritage Life Insurance Company—subsidiaries and affiliates of Allstate—were also parties to the L2000C Agreement. (R.1, ¶ 11; R.1-1, at 1.) The L2000C Agreement also incorporated the Exclusive Financial Specialist Independent Contractor Manual ("Manual"), and the provisions of the Allstate Agency Standards ("Standards"). (R.1, ¶ 12.) The Manual provided additional provisions governing the relationship between Allstate, Burns, and the Agency, addressed the "Integrity" of an Allstate representative to "act honestly and fairly" and to "never falsify any state insurance department or Allstate documents, including applications …" or "cooperat[e] with others to defraud." (*Id.*, ¶ 18.) The Standards provided policies related to completion of applications and endorsements and financial business standards. (*Id.*, ¶ 19.)

## III. Allstate Application Process

Life insurance policy applications submitted to Allstate required signatures from the proposed policy owner(s) and the agent declaring "all answers written on this application are full

and correct to the best of my knowledge and belief." (*Id.*, ¶ 20.) Applications completed in Florida also contained a notice stating "any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree." (*Id.*, ¶ 21.) The applications submitted to Allstate contained Agent Reports signed by the agent, certifying that the application is "complete, accurate and correctly recorded." (*Id.*, ¶ 22.) Per Allstate's application process and related procedures, applications were ultimately submitted to Allstate at its home office, by hard copy, by fax, or electronically through Allstate's App On-Line software program, the latter of which involved communication by email, internal links, and electronic signatures. (*Id.*, ¶¶ 23, 24.)

**IV. The Unearned Commissions**

Burns submitted numerous applications for new life insurance policies electronically. (*Id.*, ¶ 25.) Allstate alleges that prior to termination of the L2000C Agreement, Burns submitted various applications, through Agency, which resulted in payment of unearned commissions to Burns. (*Id.*, ¶¶ 33-41.) Allstate paid Agency commissions for (1) applications submitted but withdrawn by the proposed insureds before any policies were issued ("Withdrawn Applications"); (2) applications that Allstate rejected before any policies issued ("Rejected Applications"); (3) policies issued, but terminated within one year ("Terminated Policies"); and (4) policies issued to insure the lives of Burns, his family and other Allstate agents and their families, but not maintained for the full three year period ("Controlled Business Policies"). (*Id.*, ¶¶ 35-38.)

Allstate paid its agents commissions based on a schedule it established. (*Id.*, ¶ 26.) It paid commissions weekly which could be generated by new business, renewal business, or the

sale of policies issued by Allstate's affiliate, Lincoln Benefit Life Company. (*Id.*, ¶ 27.) Allstate typically paid commissions for new business upon issuance of the policy, but for applications submitted electronically (via App On-line), it paid commissions whenever applications were submitted and accompanied by initial premium payment information. (*Id.*) Commissions payable to the producing agent on new life insurance policies were subject to chargeback—or negative credit offsetting future commissions payable—under certain circumstances, such as when payment was dishonored, if a policy did not issue, or if a policy lapsed or was surrendered during the first year. (*Id.*, ¶ 29.) Commissions on a Controlled Business policy were also subject to chargeback if that policy terminated or had a decrease in face value within three years of the issue date or date of policy increase. (*Id.*, ¶ 30.)

Allstate agents received weekly commission reports setting forth commissions payable and commissions subject to chargeback, itemized by policy. (*Id.*, ¶ 33.) Allstate deemed any negative amount for net transactions processed in a month unearned. (*Id.*, ¶ 31.) As addressed in the Supplement, if termination of an agent's agreement with Allstate occurred prior to full recovery of all unearned commissions, the agent had to reimburse Allstate. (*Id.*, ¶ 32.)

Allstate alleges it paid higher commissions to the Agency than it was rightfully entitled to because Burns submitted many of the Withdrawn Applications, Rejected Applications, Terminated Policies, and Controlled Business Policies as "new business" when they were actually substitutes for existing policies that had been knowingly allowed to lapse or terminate with the intent to re-submit them as new applications ("Replacement Policies"). (*Id.*, ¶ 39.) In addition, starting in 2006, Burns allegedly bought six life insurance policies on his own life—collective value of $9,000,000—without the intent to keep them in force, but rather for the purpose of generating commissions payable to Agency. (*Id.*, ¶ 40.)

5

On October 16, 2013, Burns, through Agency, submitted certain applications to Allstate's affiliate, Lincoln Benefit Life Company. (*Id.*, ¶ 42.) These applications referenced a bank deposit account ("Bank Account Applications") as the source of the initial premium payment for the policies and some further referenced that same account as the source for payment of future premiums. (*Id.*, ¶ 44.) Allstate processed initial premium payments for some of the Bank Account Applications, but never funded them due to insufficient funds on deposit in the referenced bank deposit account. (*Id.*, ¶ 45.) None of the Bank Account Applications issued as policies, but Allstate paid Agency advance commissions on at least four of them at the time of processing. (*Id.*) The referenced bank deposit account was not owned by any of the proposed insureds, however, but instead was a personal account for an Allstate-affiliated agent who allegedly cooperated with Burns in his alleged fraudulent schemes. (*Id.*, ¶ 44.) Allstate alleges that both Burns and the cooperating agent knew that premiums could not be properly paid from the Bank Account and that payment of premiums from such accounts violated Allstate Standards, policies, and procedures. (*Id.*, ¶ 44.) Allstate further alleges that Burns knew the Bank Account Applications were phony and that payments would not be funded, but that he proceeded to submit them with the intent of obtaining advance payment of unearned commissions. (*Id.*, ¶ 46.)

## V. The Dispute

On February 7, 2014, Burns gave Allstate notice of his intent to resign, and terminated Agency's relationship with Allstate effective February 14, 2014. (*Id.*, ¶ 15.) Following termination of Defendants' relationship with Allstate, Allstate audited and reconciled commissions paid to Agency and subject to recovery under the L2000C Agreement. (*Id.*, ¶ 48.) Allstate alleges that as of September 12, 2014, the sum of unearned commissions paid to Agency was $643,669.27. (*Id.*, ¶ 41.) On July 31, 2014, Allstate sent a letter entitled "Demand for

Repayment of Unearned Commissions" to Defendants seeking reimbursement of all unearned commissions identified as of that date. (*Id.*, ¶ 49; R.1-1, Ex. B.) By separate letter on that same day, Allstate further demanded that Defendants return "all books and records of account relating to business conducted under the Agreement … for a period of five years" to an Allstate office in Florida. (R.1, ¶ 50; R.1-1, Ex. C.) Allstate alleges that Burns and Agency have failed and refused to make any reimbursement, in whole or in part and have failed to comply with the demand for return of books and records. (R.1, ¶¶ 49, 50.) Allstate filed the instant litigation against Defendants on September 12, 2014 alleging breach of contract, unjust enrichment, intentional misrepresentation, and fraud. (*See generally*, *id*.)

## LEGAL STANDARD

In deciding a motion to dismiss for improper venue under Federal Rule of Civil Procedure 12(b)(3), all allegations are taken as true, unless contradicted by the defendant's affidavits and the court may consider facts outside the pleadings. *See Faulkenberg v. CB Tax Franchise Sys., LP,* 637 F.3d 801, 806 (7th Cir. 2011). Courts must resolve any conflicts in the affidavits regarding relevant facts in the plaintiff's favor. *See Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). The Seventh Circuit has cautioned that "once the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 783; *see also Faulkenberg,* 637 F.3d at 806 (noting that the same standards apply to improper venue as do a Rule 12(b)(2) dismissal). *Id.* When a defendant challenges venue, the plaintiff bears the burden of establishing proper venue. *Nat'l Tech. Inc. v. Repcentric Solutions*, No. 13 C 1819, 2013 WL 3755052, at *5 (N.D. Ill. June 16, 2013) (citing *Int'l Travelers Cheque Co. v. BankAmerica Corp.*, 660 F.2d 215, 222 (7th Cir.

1981)). If venue is improper, the court may either dismiss the suit or transfer it to a district in which the plaintiff could have filed it initially. *See* 28 U.S.C. § 1406(a). Venue can be proper in more than one district. *See Armstrong v. LaSalle Bank Nat'l Ass'n*, 552 F.3d 613, 617 (7th Cir. 2009).

**ANALYSIS**

Defendants move to dismiss Allstate's Complaint under Rule 12(b)(3) based on improper venue, or in the alternative to transfer venue under 28 U.S.C. § 1406 to the United States District Court for the Middle District of Florida. (*See* R.9.) Allstate responds that venue is proper in this District under 28 U.S.C. §1391(b)(2) "because a substantial part of the events giving rise to Allstate's claims occurred in this District"[1] and concludes that transfer under § 1406 is inapplicable. (R.16.) Although it was not advanced as a basis for transfer by Defendants, Allstate also argues that if the Court finds venue proper, transfer to the Middle District of Florida under 28 U.S.C. § 1404(a) is still not warranted, although it admits that venue is proper there because Burns resides there. (R.16, at 6.)

Before reaching the merits of the parties' arguments regarding venue and transfer, the Court addresses the parties' affidavits. Along with their reply brief, Defendants submitted an affidavit from Burns. (R.17, Burns Aff.) The Burns Affidavit attests to Burns' relevant contacts with Allstate, not through Illinois but through Allstate affiliates in Nebraska, Texas and Florida—Lincoln Benefit Life Company and American Heritage Life Insurance Company. (*Id.*, at 9-10, ¶¶ 2-13.) The Burns Affidavit also asserts that Burns does not have the financial resources to travel to Illinois or pay the legal fees and costs to defend this action in Illinois. (*Id.*,

---

[1] Allstate's Complaint alleges venue as proper "under 28 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to the claim occurred in this District." (R.1, ¶ 6.) Allstate's briefing, however, clarifies Allstate's reliance on Section §1391(b)(2) and based on the description from Allstate's Complaint, the Court treats its basis for venue as one pursuant to Section 1391(b)(2).

8

¶ 14.) Allstate filed a motion to strike the Burns Affidavit as untimely and because it allegedly raised new facts and issues in reply to the motion. (R.18.) Allstate further argued that if considered, the Burns Affidavit does not defeat the allegations in Allstate's Complaint. (*Id.*) The Court subsequently granted-in-part and denied-in-part Allstate's Motion to Strike and afforded Allstate an opportunity to respond to the affidavit with supplemental briefing. (*See* R.22; R.23.)

While it is generally true that arguments raised in a reply brief are deemed waived, it is also true that a party can counter arguments raised in a response brief. *See United States v. Turner,* 203 F.3d 1010, 1019 (7th Cir. 2000); *see also Tellabs Operations, Inc. v. Fujitsu Ltd.*, 283 F.R.D. 374, 379 (N.D. Ill. 2012) (citations omitted); *Cars R Us Sales & Rentals, Inc. v. Ford Motor Co.*, No. 08 C 50270, 2011 WL 1225468, at *1 (N.D. Ill. Mar. 31, 2011). Allstate's Response to Defendants' Motion to Dismiss first raised the prospect of a transfer under Section 1404 and Defendants' Reply addressed this argument. (*See* R.16, at 6-9; R.17). The Burns Affidavit briefly addresses Burns' financial hardship in litigating in this District and Allstate concedes that this statement is more properly construed as a response to the arguments for transfer under Section 1404. (R.22.) Defendants also assert that the Burns Affidavit addresses Allstate's allegations that Burns submitted life insurance policies to Allstate's home office resulting in systematic communications between Burns and Illinois. (*See* R.23 (citing R.16, at 5).) Allstate's Sur-reply includes an affidavit from an Allstate representative, Paul Lanspa, who attests to personal communications with Burns about commission chargebacks and further attests to Burns' electronic submission of the Bank Account Applications to Allstate's home office in Illinois, both events which underlie Allstate's allegations. (R.22, Lanspa Aff.) The Court finds the Burns Affidavit is properly considered as it addresses matters raised by Allstate in its

Response Brief and because the Court ensured both parties a full and fair opportunity to address and respond to the Burns Affidavit, it also fully considers the Lanspa Affidavit submitted by Allstate along with the arguments in the supplemental briefing. *See Faulkenberg*, 637 F.3d at 806 (explaining that courts may consider evidence outside of the pleadings in resolving a motion to dismiss for lack of proper venue).

## I. Venue is Improper in this District under 28 U.S.C. § 1391(b)(2)

Section 1391(b)(2) permits a civil action to be brought in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." 28 U.S.C. § 1391(b)(2). The test for a determination of proper venue under Section 1391(b)(2) "is not whether a majority of the activities pertaining to the case were performed in a particular district, but whether a substantial portion of the activities giving rise to the claim occurred in a particular district." *See Jackson v. N'Genuity Enters., Co.*, No. 14 C 2197, 2014 WL 4269448, at *6-7 (N.D. Ill. Aug. 28, 2014) (citation omitted). To determine proper venue in a breach of contract action, courts take a number of factors into consideration, including "where the conduct underlying the breach occurred and where performance under the contract was to take place," and whether there was "[f]ailure to make payment in a district pursuant to a contract." *Imperial Crane Servs., Inc. v. Cloverdale Equip. Co.*, No. 13 C 04750, 2013 WL 5904527, at *3 (N.D. Ill. Nov. 4, 2013) (citations omitted); *see also Moran Ind., Inc. v. Higdon,* No. 07 C 6092, 2008 WL 4874114, at *5 (N.D. Ill. June 26, 2008) (citations omitted) (considering where performance under the contract was to take place in determining venue under § 1391(b)(2)). When the underlying events consist of communications made by two parties located in separate districts, "the requirements of §1391(b)(2) may be satisfied by a communication transmitted to or from the district in which the cause of actions was filed, given a sufficient relationship between the

10

communication and the cause of action." *Imperial Crane Servs.*, 2013 WL 5904527, at *3. It is also sufficient for the plaintiff to establish the "substantial" nature of an event in the forum district if it is shown to be a "part of the historical predicate for the instant suit." *Jackson*, 2014 WL 4269448, at *7.

Allstate does not assert that the parties negotiated or formed the contract in Illinois, nor does it assert that either party's performance under the contract was to take place in Illinois. The L2000C Agreement explicitly states that the Agency has a business location in Kissimee, Florida and that performance would take place in Florida. (*See* R.1-1, §§ V(A), V(C) (stating the "Agency is authorized to sell insurance offered by [Allstate and the companies specified in the Supplement—Lincoln Benefit Life Company and American Heritage Life Insurance Company] in the state containing its business location …").) Allstate does not point to any language in the L2000C Agreement that identifies Allstate as an Illinois company or as having a home office in Northbrook, Illinois. Indeed, the only location specified for Allstate in the L2000C Agreement is a Florida address. (*See id.*, § XX. Notice: "if to the Company: Allstate Life Insurance Company, 780 Carillon Pkwy, St Petersburg, FL, 33716, Attention: Human Resources.")[2]

Allstate focuses on events in Illinois that it alleges "form the basis of all claims asserted in the Complaint". (R.16, at 5.) Namely, Allstate relies on Burns' communications and alleged phony submissions to Allstate's home office in Northbrook, Illinois, and the issuance of payments to Burns for unearned commissions from Allstate's home office. (R.16, at 5.) Defendants respond to Allstate's first basis, asserting that the applications at issue were not submitted to Allstate in Illinois but were submitted to Allstate's affiliates in Nebraska and Texas

---

[2] This same Florida address for Allstate Insurance Company is identified as the address to which Allstate demanded Burns return all books and records in its Demand Letter dated July 31, 2014. (R.1-1, attached as Ex. C to Allstate's Compl.)

11

(Lincoln Benefit Life Company) and Florida (American Heritage Life Insurance Company). (R.17, at 1; R.17, Burns Aff., ¶¶ 6-7, 12-13.) Allstate does not directly dispute this point, but argues that email communications between Burns and individuals at Allstate's home office as well as the eventual transmission of these applications to Allstate's home office provides evidence of a substantial event for the purpose of establishing venue in Illinois.

Allstate's reliance on communications between Burns and Lanspa is insufficient to establish venue. In particular, Allstate relies on its representative, Mr. Lanspa, who attests to communications between Burns and managers at Allstate's home office relating to insurance applications and compensation. (R.22, Lanspa Aff., ¶¶ 7, 8.) Mr. Lanspa also contends that he personally had numerous email and telephone communications with Burns to answer Burns' questions regarding commissions and production metrics and attached examples of two such communications. (*Id.*, ¶ 8.) These two email communications, however, do not support Allstate's position that Burns communicated directly with Allstate's home office in Illinois regarding the events forming the basis of Allstate's claims. The first email chain originated with an email sent by an Allstate Financial Sales Consultant in Florida (Phillip Greenfield) to Lanspa in 2010, with Burns copied. After Lanspa responded to a question posed by the Florida Allstate official to him, Burns simply sent an email stating "Thanks for your help". (R.22, Ex. 1(a).) Allstate provides no argument or evidence that the substance of the 2010 email relates to any of its claims in this case. The second email chain, originated with an email from Burns to another Allstate employee in Florida (Cinda Mersel), who then copied an additional person (Lawrence Brown) on his reply, and that individual replied to Burns and others additionally copying Lanspa and the Northbrook, Illinois compensation team. (*Id.*, Ex. 1(b).) Lanspa then responded to the chain indicating he would push off commission chargebacks to which Burns responded with a

brief statement of thanks and a question about payment of renewals and policy numbers. (*Id.*) In support of its assertion that Burns submitted his applications to Allstate's Illinois office, Allstate relies on case notes from an electronically submitted Bank Account Application. (*Id.*, Lanspa Aff., ¶ 9.) The case notes, however, indicate that prior to being received by the Allstate case coordination team in Illinois, the application went through three other individuals with no location identified for these transactions. (*See* R.22, Ex. 1(a); *id.*, Ex. 1(b).) Burns argues that he electronically submitted applications, not to Illinois, but to Lincoln Benefit Company in Nebraska, and later to Texas. (R.17, Burns Aff., ¶¶ 8, 9.) Allstate's evidence demonstrates that at some point the home office in Illinois became involved, but does not contradict the fact that Burns directly submitted the applications elsewhere.[3]

Regarding Allstate's second basis—issuance of payments to Burns for unearned commissions from Illinois—this event does not constitute performance as contemplated under the L2000C Agreement. Indeed, Burns' performance under the L2000C Agreement was only contemplated in Florida and any payment of compensation to Burns from Allstate under the contract was not identified as occurring from Allstate in Illinois. Under the venue analysis, Allstate's payments to Burns from Illinois constitute economic harm suffered by Allstate as an Illinois company, but do not amount to an omission or failure to act or perform as agreed to in the L2000C Agreement at issue. A plaintiff's economic harm felt in the original forum is not sufficient for a finding of proper venue under Section 1391(b)(2). *See MB Financial Bank, N.A.*

---

[3] Similarly, Allstate's reliance on its examination and processing of the applications that eventually ended up at its home office is also insufficient because the venue analysis under Section 1391(b)(2) generally looks to the acts of the defendant, rather than those of the plaintiff. *See MB Financial Bank*, 741 F.Supp.2d at 918 (citing *Woodke v. Dahm*, 70 F.3d 983, 985 (8th Cir.1995) ("we are reluctant to impute to Congress an intent to abandon altogether the protection of defendants as a relevant consideration in venue matters. We think it far more likely that by referring to 'events or omissions giving rise to the claim,' Congress meant to require courts to focus on relevant activities of the defendant, not of the plaintiff")).

*v. Walker*, 741 F.Supp.2d 912, 917 (N.D. Ill. 2010) (finding the plaintiff's "economic harm in Illinois by virtue of its being situated here, does not mean that venue is proper in this district"); *Moran*, 2008 WL 4874114, at *5 (finding venue improper in Illinois even though "some events related to the contract occurred in Illinois, and plaintiff may have felt the impact of the alleged breaches here" because "Illinois is not where a substantial part of the events underlying the contract claims occurred"); *Financial Mgmt. Serv., Inc. v. Coburn Supply Co, Inc.*, No. 02 C 8928, 2003 WL 255232, at *2 (N.D. Ill. Feb. 5, 2003) (finding the plaintiff's economic harm resulting in the original forum from the defendant's alleged actions insufficient to satisfy venue under 1391(b)(2)).

Taken in the light most favorable to Allstate, the Illinois events upon which Allstate relies are not enough to overcome the strong connection that this breach of contract, misrepresentation, and fraud case has with Florida. While it is true that the substantial event test for venue does not require a majority of the events to occur in a particular district, it does require that "a substantial portion of the activities giving rise to the claim occurred in a particular district." *See Jackson*, 2014 WL 4269448, at *6. The L2000C Agreement was entered into for the purpose of Allstate having a business location through Burns and Agency in Florida and the parties' performance under that contract was only contemplated in Florida. Furthermore, all the applications and policies that form the basis of Allstate's claims were submitted by Defendants from Florida regarding the sale of insurance to customers in Florida. These facts demonstrate that a substantial part of the events giving rise to Allstate's claim did not occur in Illinois, but rather occurred in Florida. Taken in the light most favorable to Allstate, the evidence submitted to establish venue does not support its accusations. Furthermore, any economic harm Allstate suffered in reliance on the application information submitted by Burns to pay Agency

14

commissions, is not enough to meet the substantial part test for venue here. *See MB Financial Bank, N.A.*, 741 F.Supp.2d at 917 (finding venue improper in Illinois under the substantial part test where the contract was solicited and negotiated in Nevada, the money went to a Nevada company, and the purported actions of wrongdoing happened in Nevada even though the defendant signed the contract in Illinois and the plaintiff suffered economic harm in Illinois). As such, venue in this District is not proper.

Allstate's reliance on other cases from this District to support a finding of venue fails. In *Fogelson*, for example, the letter containing "the most concrete alleged misrepresentation" underlying the plaintiff's claim for fraudulent misrepresentation with respect to ownership of land was prepared in and mailed from Chicago and after receiving the defendants' signatures was sent back to Chicago. *Fogelson v. Iatrides,* No. 99 C 6892, 2000 WL 631293, at *1 (N.D. Ill. May 12, 2000). The plaintiff, located in Illinois, alleged several direct communications—phone and letter—to the defendants, located in Indiana, initiated by both parties. *Id.*, at *3. In *Jackson*, venue was proper because the defendant initiated direct communication with the Illinois plaintiff prior to the filing of the suit and the defendant's legal counsel allegedly sent false and misleading materials directly to the Illinois plaintiff. *Jackson*, 2014 WL 4269448, at *6. Similarly, in *Mercantile Capital Partners*, the defendant directly sent copies of alleged false securities filings, phony transaction documents, and misstatements regarding assets to the Illinois plaintiff. *Mercantile Capital Partners v. Agenzia Sports, Inc.*, 2005 WL 351926, at *5 (N.D. Ill. Feb. 10, 2005).

Unlike the plaintiffs in the above cases, the facts taken in the light most favorable to Allstate do not show that the alleged misrepresentations in the various applications submitted by Burns were directed to Allstate in Illinois. Instead, Burns submitted these applications—

including the Bank Account Applications—electronically through a website via Lincoln Benefit Life Company in Nebraska and later Texas. Rather than disputing this point, Allstate argues that the eventual transmission of these applications—albeit by someone other than Burns—to Allstate's home office in Illinois is evidence of substantial events in Illinois. Given that the application was made in Florida and transmitted from Florida to Allstate affiliates in Nebraska and Texas, the subsequent indirect connection with Illinois initiated by others is too attenuated to constitute a substantial portion of activity giving rise to Allstate's claim in Illinois. *See e.g., Brunswick Corp. v. Thorsell*, No. 13 C 9222, 2014 WL 1612668, *2 (N.D. Ill. Apr. 21, 2014) (explaining 1391(b)(2) to require more than "some tangential connection" to the chosen venue). The substantial portion of the events giving rise to Allstate's claims occurred in Florida, despite the later, indirect connections with Illinois. *See Moran*, 2008 WL 4874114, at *5 (finding venue in this District improper where the agreements were "finalized" in Illinois, but the initial discussions and execution of the agreements were in Tennessee and the performance of the agreements in dispute was to occur in Tennessee and Kentucky); *Circle Grp. Internet, Inc. v. Atlas, Pearlman, Trop & Borkson, P.A.*, No. 01 C 7338, 2002 WL 1559637, at *3 (July 16, 2002) (finding venue improper in this District because the meetings and telephone, fax, mail and email communications between the Illinois plaintiff and the defendants were "more tangential than substantial and are thus insufficient to establish venue here"). Accordingly, the Northern District of Illinois is not the proper venue for Allstate's claims.[4]

---

[4] Because the Court finds venue improper in this District, the parties' arguments relating to transfer under 28 U.S.C. § 1404(a) which requires venue in the originating district to be proper are not addressed as they are considered moot.

## II. Transfer to the Middle District of Florida is Proper

Given that this District is not the proper venue for Allstate's claims, the analysis turns to whether the Court simply dismisses or transfers the case under Section 1406, which states:

> The district court of a district in which is filed a case laying venue in the wrong division or district *shall dismiss, or if it be in the interest of justice, transfer such case* to any district or division in which it could have been brought.

28 U.S.C. § 1406 (emphasis added). Courts in this District have "broad discretion" to order a transfer of a case. *See Continental Ins. C. v. M/V Orsula*, 354 F.3d 603, 608 (7th Cir. 2003). Defendants reside in Florida and the contract at issue surrounds business in Florida. (R.1, ¶¶ 3, 4, 10; R.1-1.) Because the parties do not dispute that Florida is a proper venue for this case, (*see* R.9, at 4; R. 16, at 6-7), the Court, exercising its discretion under 28 U.S.C. § 1406, finds that in the interest of justice a transfer—rather than a dismissal—is more appropriate, and transfers this case in its entirety to the Middle District of Florida.

## CONCLUSION

For the reasons stated above, the Court grants in part and denies in part Defendants' Motion to Dismiss and transfers the case in its entirety to the Middle District of Florida.

**DATED:  February 23, 2015**                ENTERED

_____
AMY J. ST. EVE
United States District Court Judge

17